**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**GEORGE FREEMAN**, an individual;                    Case No.: 8:15-cv-2262-JSM-EAJ
and **FLORIDA CARRY, INC.**, a
Florida non-profit corporation;
                    Plaintiffs;

vs.

**CITY OF TAMPA, FLORIDA**,
a municipality; **ROCCO CORBINO**.
an individual; **TRAVIS A. RICHARDS**,
an individual; **THREE UNKNOWN**
**OFFICERS OF THE TAMPA POLICE**
**DEPARTMENT**, individually; **RONALD**
**E. GRAHAM**, in his official capacity and
individually; **CHIEF ERIC WARD**, in his
official capacity and individually and
individual; **ROBERT F. BUCKHORN**, in his
official capacity and individually;
                    Defendants.
_____/

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND**
**MEMORANDUM OF LAW**

        **COMES NOW** the Plaintiffs, **GEORGE FREEMAN** and **FLORIDA CARRY, INC.**,

and file this *PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND*

*MEMORANDUM OF LAW.*

I.      **Defendant Officers cannot consistently claim that they were acting in the course of**
        **their duty such that they are entitled to qualified immunity while also claiming they**
        **were not acting to enforce a rule, policy, or regulation of Defendant City of Tampa.**

        Defendants' argument is that the actions of the Defendants in this case were not based

on any  ordinance **"enacted"** by the City of Tampa or its police department but instead were the

individual actions of the Defendant officers.  At the same time they contend that the Defendant officers were acting within the course and scope of their duties, performing a discretionary function, and are therefore entitled to qualified immunity for their actions. (Dckt. 11, pg. 7)

The Court cannot make contradictory rulings and grant both of the Defendants' contrary positions in its motion.  They are completely inconsistent. If the officers were carrying out a discretionary function of their duty such that they are entitled to qualified immunity under 42 U.S.C. Sec. 1983, then they were acting on behalf of the city of Tampa and Mayor Buckhorn for purposes of Sec. 790.33, Fla. Stat.  Unlike a Sec. 1983 action there is some level of respondent superior liability in a Sec. 790.33 action. Sec. 790.33(3)(c), Fla. Stat.(holding liable elected or appointed local government officials or administrative agency heads under whose jurisdiction the violations occur.)  In the alternative, if the officers were not acting on behalf of the City and Buckhorn, then they were not carrying out a discretionary function and qualified immunity does not apply.

Sec. 790.33 has a clearly stated legislative purpose to, "deter and prevent the violation of this section and the violation of rights protected under the constitution and laws of this state related to firearms, ammunition, or components thereof, by the abuse of official authority that occurs when enactments are passed in violation of state law *or under color of local or state authority*." Sec. 790.33(2)(b), Fla. Stat. (emphasis added).  Defendants' motion focuses solely on the language, "enactments are passed in violation of state law" and ignores the disjunctive clause, "*or under color of local or state authority*."  Assuming the Defendant officers were acting within the course and scope of their  duties for the City, in order to harass a citizen exercising his rights under the U.S. and Florida constitutions. See, Sec. 790.25(3)(h), Fla. Stat.

## II.      Sec. 790.33 prohibits the violation of the rights to keep and bear arms under color of local or state authority.

### A.      Plaintiffs are not required to show that there was a written or express ordinance, policy or rule.

Defendants' reading of Sec. 790.33 to only prohibit enactments actually passed by a governing body is nonsensical when read in pari materia with the rest of the statute.   See generally, *Peoples v. State*, 287 So.2d 63, 66 (Fla. 1973)(holding that the plain text of a statute cannot be relied upon when it is completely inconsistent with the express policy and intent of the statute).   Sec. 790.33, Fla. Stat., includes a provision authorizing suit against any entity that enforces a policy in violation of the statewide preemption of firearms law. Sec. 790.33(3)(f), Fla. Stat.   Policies may be written or unwritten and are defined as, "a definite course or method of action selected from among alternatives and in light of given conditions to guide and determine present and future decisions. *Merriam-Webster.com* (last visited October 26, 2015). Nothing in the statute requires polices to be in writing.   The Court is required to give effect to all words in the statute as well as the intent behind the statue where there is any ambiguity. See generally, *Florida Carry, Inc. v. University of North Florida*, 133 So. 3d 966 (Fla. 1st DCA 2013).

Defendants argue that Plaintiffs are required to point to a specific enactment in violation of firearms preemption.   Such a reading is inconsistent with the stated intent of the statute to deter and prevent violations of rights that occur by the abuse of official authority.   Sec. 790.33(2)(b), Fla. Stat. Defendants cite three cases which claim stand for the proposition that Sec. 790.33 regulates only the enactment of ordinances by local governments and state agencies. (Dckt 11, pgs. 5-6)  They read too much into these cases, claiming that because each of the cited cases involves an ordinance or rule enacted and published, that Sec. 790.33 does not apply to

unwritten polices enforced on behalf of a local government. There is no such discussion or holding in any of the cited cases. Defendants' leaping logical inference falls far short of an established legal precedent supporting their argument.

Defendants' claim that the trespass warning was issued based on the trespass statute rather than on any regulation of firearms proves too much.  Taking the allegations of the complaint as true, there was no legal basis for the issuance of a trespass warning. **other case Defendants admit as much by the cancellation of the trespass warning only after learning of Plaintiffs' intent to sue.  (Def. MTD, Ex. D).  Freeman was issued a trespass warning solely in retaliation for his exercise of the right to bear arms and free speech.  This was an act carried out by agents of the city of Tampa to enforce their unwritten policy, to suppress Plaintiffs' exercise of constitutional rights, and to punish Plaintiff Freeman who had committed no crime.

Despite repeal of its unlawful ordinance, Defendants trespassed Freeman for exercising his statutory and constitutional rights while fishing.  The language of the trespass order even states as justification that "[s]ubject was fishing at pier while carrying openly a handgun in a side holster." (Dckt 11, Att. A).

### III.   Qualified immunity does not apply because the provisions of Sec. 790.25, allowing the open carry of firearms while fishing is the clearly established law of Florida.

Defendants argue that the law was not clearly established at the time of Freeman's detention and therefore they are entitled to qualified immunity.  Defendants make two arguments to support this position.  First, they argue that because the officers were aware of 790.053's prohibitions, but not the exemptions of Sec. 790.25, they had an arguable basis for their actions. Second, relying on the case of *Heien v. North Carolina*, they argue that good faith ignorance of

the law, while not available to mere mortals like Plaintiffs, protects them from liability.

Defendant officers cannot claim a reasonable mistake of law. Arguing that a statute that has been in existence for 50 years is not clearly established is absurd. It is per se unreasonable for an officer to claim that a hunter, camper, or fisherman may not be armed while engaged in such activities. Sec. 790.25(3)(h), Fla. Stat. Freeman attempted to educate the officers regarding a well established provision of Florida law that has remained unchanged since 1965. The officers chose not to listen, and responded with profanity and derision (Comp. Para. 54 and 62). Defendants had every opportunity to review the law, determined that no law had been violated (Comp. Para 66), and despite determining that no law had been violated, infringed Freeman's First and Second Amendment rights by denying him access to all city parks by the issuance of a trespass order.

### A. Defendant officers knew or should have known that Plaintiff Freeman's conduct was lawful given the well established law and the totality of circumstances.

Given the clarity and longevity of Sec. 790.33 (1987) and Sec 790.25 (1965), there is no valid basis for Defendants to argue that they had an objectively reasonable mistake of law or that the law was not clearly established. Sec. 790.25 makes clear that persons who are engaged in fishing, as Mr. Freeman was, are allowed to openly carry firearms. Sec. 790.33 is just as clear that there is no authority for police officers to rely on local ordinances, rules, or policies, to issue trespass warnings or otherwise violate the constitutional rights of law abiding gun owners when the totality of the circumstances indicate they are in compliance with state law. See, *Mackey v. State*, 124 So.3d 176 (Fla. 2013)(requiring a totality of the circumstances analysis before detaining a person for possession of a firearm) and *Regalado v. State*, 25 So.3d 600 (Fla. 4th

DCA 2009)(holding that mere possession of a firearm is not probable cause justifying a seizure).

Defendants claim they cannot be expected to know every law and must be allowed room for mistakes.  This consistent with well established precedent, but the Defendants protest too much.  Sec. 790.25 is not an arcane, unused, or obsolete law nor is it new or not clearly established.  Defendants freely admit their prior knowledge of Sec. 790.25 as shown by a 2011 Legal Bulletin issued to the police department by their own legal advisor. (Dckt. 11, Att. C).

Sec. 790.06(4)(c), Fla. Stat., requires any person, such as Mr. Freeman or members of Florida Carry, who seek a Concealed Weapon Firearm License (CWFL), to attest under oath that they have been furnished a copy of Chapter 790, Fla. Stat., and are "knowledgeable of its provisions." Defendants seek to have this Court rule that an officer who carries a firearm openly, as part of their duties, and with the full power of the state, does not have a similar duty to be knowledgeable regarding Chapter 790.  Defendants do not even want to be held responsible for ignorance of Secs. 790.25(3)(d) and (h).  These two, co-equal provisions of the same subsection authorize not only Freeman in (h), but the officers in (d), to carry their firearms.  This is an example of ignorance of convenience and clear incompetence regarding the laws of this State.

Defendants seek to rely on *Mattox* for the proposition that the existence of an abstract right does not equate to knowledge that the officer's actions infringes the right.  *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997).  *Mattox* however is limited in its applicability by the Supreme Court's earlier decision in *Anderson v. Creighton*, 483 U.S. 635 (1987).  *Anderson* contains extensive discussion regarding the distinction between knowledge of an abstract right and knowledge that specific conduct violates that abstract right.  *Anderson* at 639-40.  *Anderson* makes clear that a specific official action need not be held unconstitutional to defeat a claim of

qualified immunity. *Id.* at 640.

Unlike *Anderson* and *Mattox*, this is not a case of an abstract right to be free from unreasonable detentions. The right to not be detained without reasonable suspicion of some crime is more than well established. This case is about the right to openly carry a firearm while fishing, or going to or from, which is a well established part of Florida's statutory law. Had the totality of circumstances not indicated that Freeman was fishing, a different result might be necessary. Defendants admit their knowledge that Freeman was fishing.

Defendants argue that their ignorance of Sec. 790.25's exceptions to Sec. 790.053 should excuse their conduct. Had they released Freeman without incident after a reasonable opportunity to review the relevant statutory provisions they might be right. The totality of Defendants conduct shows a more sinister side; the intentional punishment of Freeman and impairment of his rights, even after they had knowledge of Sec. 790.25 and its specific provisions.

**B.     Continued violation of Plaintiff's civil rights after an opportunity to learn the law vitiates any claim of qualified immunity for actions taken with full knowledge of the law.**

Whether or not officers were aware of the law when they first detained Freeman, Defendants do not dispute that they were well aware of the law by the time they issued the trespass warning. To argue to the contrary would require explaining why they did not arrest him for one of the violations they claimed to have suspected when the detention began.

The officers' claim they did not know it was unlawful to issue a trespass warning based on conduct that they had already learned was lawful, is illogical and contrary to the well established precedent that Freeman has a right to gather with others, stroll aimlessly, or carry his firearm while fishing. (Def. MTD at Pg. 10)(claiming that even if officers were aware of the law

they are immune if they were unaware their conduct was a violation of Plaintiffs' rights). See,

*Catron v. City of St. Petersburg*, 658 F.3d 1260 (11th Cir. 2011).

**C.**     **Defendants actions exceeded any reasonable suspicion, probable cause or other authority granted by Sec. 901.151, Fla. Stat., to temporarily disarm Plaintiff Freeman for purposes of officer safety, and were instead a search prohibited by the Fourth Amendment, and a violation of Plaintiff Freeman's civil rights.**

In order to rely on Sec. 901.151, Defendants' must first establish that the statute at least arguably applied in their encounter with Freeman.  The first element necessary to conduct stop and frisk under *Terry* decision and its progeny, or under Sec 901.151, is whether the officers, given the totality of the circumstances, had a reasonable suspicion that a person is committing or is about to commit a violation of the law.  The Defendant officers cannot meet this first element, even with their preferential ***arguable*** standard and therefore had no basis for detaining and disarming of Freeman in the first place.

**D.**     **Based on the allegations of the Complaint, Defendants did not have arguable reasonable suspicion that Freeman had either violated the open carry law or committed an aggravated assault.**

The facts as set forth by the Complaint are the only facts relevant at this stage. Defendants offer no facts to argue that Defendants had arguable reasonable suspicion to detain Freeman to investigate a possible violation of the open carry law or an aggravated assault. Defendants postulate that because Freeman admits he was questioned regarding how he moved from his car to the pier, there is a reasonable inference that Defendants were investigating a case and had an arguable reasonable suspicion to do so. Of course Defendants do not use the term reasonable inferences, as all such inferences must be in favor of the non-moving party.

Defendants argue that they received a call from a citizen leading to a presumption that

the complainant was placed in fear by Plaintiff's firearm.  Defendants cite no authority for the necessary corollary that the lawful possession of a holstered firearm by citizen constitutes an arguable reasonable suspicion to believe that an aggravated assault or any other crime has occurred.  On the contrary, the controlling precedent in Florida is clear, mere possession of a firearm is not reasonable suspicion that a crime has been committed.  *Regalado* at 601 (finding no reasonable suspicion where there was no information of suspicious criminal activity other than Defendant's possession of a gun, and "mere possession of a weapon, without more, cannot justify a *Terry* stop"); accord *Mackey v. State* at 185; see also *J.L. v. State*, 727 So.2d 204, 208-09 (Fla. 1998)(there is no "firearm exception" to the Fourth Amendment); and *Florida v. J.L.*, 529 U.S. 266 (2000)(upholding ruling of Florida Supreme Court in *J.L. v. State,* holding that allegations of illegal possession of a firearm do not justify a Terry stop).

Both the Florida Supreme Court and the Southern District of Florida have held that the proper test to determine whether officers have a reasonable suspicion of criminal activity is the totality of the circumstances as set forth in *Terry* and other Fourth Amendment jurisprudence. *Mackey* at 181 and 185.  See also, *United States v. Spann*, 2015 U.S. Dist LEXIS 57386, 14 (S.D. Fla. April 21, 2015)("the determination of whether there is probable cause to believe a defendant committed the offense of openly carrying a firearm is governed by the well-established totality of the circumstances standard. This standard necessarily includes consideration of whether it appears that an affirmative defense exists, . . .").

In this case, the totality of the circumstances as alleged in the complaint are that Freeman was engaged in fishing.  (Comp. 42) Someone reported to police that they were concerned with Freeman's open possession of a firearm.  Upon police arrival they observed Freeman engaged

in the act of fishing (Comp. 42).  Without warning or further evidence or indicia of criminal

activity, Defendants committed a theft by snatching of Freeman's property.  (Comp. 45).

> **E.      Defendants went far beyond conduct authorized by Sec. 901.151, and conducted several warrantless searches in violation of Freeman's Fourth Amendment rights.**

While Defendants spend much time and effort attempting to justify the initial detention

of Freeman by screaming "but, GUN!" and hoping this Court has a severe case of hoplophobia,[1]

Defendants fail to address conduct that went far beyond the bounds of investigating a possible

aggravated assault or open carry.  Defendant officers searched Freeman thoroughly, including

going through his wallet. (Comp. 51).  They seized and searched Freeman's wallet and phone

in an attempt to identify members of Florida Carry.  (Comp. 53).  They then used the seized keys

to search Plaintiff's vehicle and seize another firearm, even though Plaintiff was never near his

vehicle and did not give consent to the search.  (Comp. 57).

Defendants make no claim in their motion to dismiss that any of these searches were

authorized by any arguable legal basis.  Defendants simply ignore the factual allegations.  The

failure to address these violations alone is sufficient to deny Defendants' claim of qualified

immunity as a whole.

> **F.      Defendants' issuance of a trespass warning violated Freeman's First Amendment rights.**

While Defendants may be able to rely on Sec. 901.151 the Florida Stop and Frisk Law[2]

---

[1]

Defined as an "irrational aversion to weapons." It is also used to describe the "fear of firearms" or the "fear of armed citizens." Hoplophobia is a political term and not a recognized medical phobia.
https://en.wikipedia.org/wiki/Hoplophobia#cite_note-Pittsburgh_Tribune-Review-1 (last visited Nov. 6, 2015).

[2]

While not relevant at this stage of the proceedings, Defendants do not concede that the Florida Stop and Frisk law is constitutional as applied to law abiding citizens exercising the fundamental, individual right to keep and

to justify the temporary disarmament of law abiding persons exercising their fundamental constitutional right to bear arms, nothing in that statute allowed Defendants to conduct additional searches by running serial numbers, or conducting unauthorized and non-consensual searches of Freeman's vehicle or cell phone and impairing his and Florida Carry's rights of associational privacy.

Defendants reliance on *Redd* to claim that a finding of reasonable suspicion for the detention  requires dismissal of Count 10 is misplaced.  The court in *Redd* found that because the officers there had "arguable probable cause to arrest Anderson for disorderly conduct, we must hold that the officers are also entitled to qualified immunity from the plaintiffs' First Amendment claims."  *Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998).  Here there is no arrest and the First Amendment violation is completely separate and apart from whether there was reasonable suspicion in the first instance.

Corbino had actual knowledge that Freeman had committed no crime at the time Corbino issued the trespass warning. (Comp. 268).  Corbino chose to detain Freeman for an additional time period to complete the trespass warning after determining there was no violation of the law. (Comp. 270).  That act alone was a deprivation of Freeman's well established  right to be free from further unreasonable seizure by continued detention.  *Rodriguez v. United States,* 135 S. Ct. 1609, 1612 (April 21, 2015)(holding that a detention beyond the length necessary to accomplish the purpose of the detention, violates constitutional rights).

Defendants claim that Plaintiffs do not show that the speech at issue is protected by the First Amendment, or that the adverse action was prompted or caused by the exercise of

---

bear arms.  *State v. Serna*, 331 P.3d 405 (Ariz. 2014).

Plaintiff's First Amendment rights, citing *Vila v. Padron*. That case has no applicability here. The elements set forth in *Vila* are for a public employee retaliation claim. *Vila*, 484 F.3d 1334, 1339 (11th Cir. 2007). There is nothing remotely similar about *Vila* and the instant case. This is not a case of retaliation requiring proof that the speech acted against is protected. See, *Pelt v. Dept. of Transp.,* 664 So.2d 320 (Fla. 1st DCA 1995)(setting forth distinction between public employees and others under Sec. 790.33, Fla. Stat.). This case is about whether Defendants impaired Freeman's First Amendment right to exercise his right to free speech generally and his right of association in a traditional public fora. See, *Catron v. City of St. Petersburg*, 658 F.3d 1260 (11th Cir. 2011)("All Florida Citizens have a right under the Florida Constitution to chat on a public street, stroll aimlessly, and saunter down a sidewalk.").

The trespass warning prohibited Freeman from using the traditional public fora of Tampa city parks to engage in free speech. (Comp. 265). It was also issued to deny Freeman the ability to exercise his rights in a public park. (Comp. 266). Because Corbino had the opportunity and had investigated the law, there can be no doubt that his actions were taken in retaliation against Freeman and with the knowing intent to violate the rights Corbino had already confirmed Freeman to have. Count 10 should not be dismissed, regardless of whether arguable reasonable suspicion existed for the initial detention.

**IV.     The issuance and existence of the trespass order for some number of days is sufficient to allow Plaintiffs to bring a claim for damages for the violation of their rights on those days regardless of the later rescinding of the order by Defendants**.

The later revocation of the trespass order does not moot this case. It is undisputed that for some number of days, Freeman was prohibited from going to city parks in Tampa, and that members of Florida Carry had every reason to believe that lawfully exercising their rights in

Tampa parks would receive similar treatment.  A later rescinding of the illegal policy and actions by Defendants does not preclude a claim for the damages that occurred in the interim.  See *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)(stating that where there is deprivation of a constitutional right constitutes, irreparable injury is presumed and holding that impairing the right to the right to bear arms was a deprivation of Second Amendment rights)

**V.     Municipal liability is appropriate.**

Defendant Tampa was well aware of the risk to the public by uninformed and uneducated officers, as the officers here claim to be, so much so that the City issued a Legal Bulletin.  (Dckt 11, Att. C).  In the bulletin, the police legal advisor, Kirby Rainsberger, advised "all sworn personnel" of the preemption law, and that exceptions set forth in 790.25(3) should be reviewed. For some reason Mr. Rainsberger, only felt it necessary that officers review the exceptions before making a charging decision rather than having a general familiarity with the exceptions to avoid harassment of law abiding gun owners, and violations of their rights.  Mr. Rainsberger also claimed that "the possession and discharge of firearms with the city remains heavily restricted." Such language easily supports an inference that Tampa intended to leave officers with the impression that firearms in the city were to be the exception not the rule, and that officers should continue to treat with suspicion any person with a firearm, especially those in city parks, regardless of the repeal of the preempted ordinance.

As noted in the complaint, Mr. Rainseberger, was notified and made aware by Plaintiff Florida Carry, of the law and the plans by Plaintiff's members to open carry while fishing in Tampa.  (Comp. 33).  Based on the legal bulletin and his position with the City of Tampa, the Court should draw the reasonable inference that Mr. Rainsberger was the final policy maker

when it comes to police procedures and training.  He certainly had the authority to direct policy, and represented that he was the contact person for any officers with questions about firearm law and policy as interpreted by the City of Tampa.  (Dckt. 11, Att. C).

Mr. Rainsberger acknowledged prior to the instant case that he was aware of Florida law and had properly advised his officers.  (Comp. 33).  Given the City's knowledge that members of Florida Carry intended to fish from the Ballast Point Pier, it certainly had knowledge that persons would be open carrying while fishing at that location.  Additionally, Defendants' attempts to get this Court to recognize a firearms exception to the Fourth Amendment as well as their arguments that the very carrying of a firearm creates a fear in citizens who may call for police assistance, shows Defendants were on notice of the likelihood of police interactions with persons exercising their right to open carry.  Such interactions carry a concomitant likelihood of constitutional violations by officers interacting with lawfully armed individuals that is so high the need for training should have been as obvious to the city as it was to Florida Carry, which contacted the city month after month to prevent such violations.  (Comp. 30-33).  The fact that out of six officers, including one in a supervisory capacity, not one objected to or realized that Freeman's conduct was entirely lawful, shows that this was not a case of a single officer being unaware of the law, but a pervasive issue where no officers appear to have been trained to deal with the law abiding gun carrier.

An additional factor the Court should consider is the likelihood of encountering a law abiding gun owner.  There are over 1.4 million people with a Florida CWFL. http://www.freshfromflorida.com/content/download/7502/118869/cw_active.pdf (last visited Nov. 6, 2015).  Additionally, any person in Florida who is not a convicted felon or otherwise a

prohibited person, may keep a firearm in their private vehicle.  Sec. 790.25, Fla. Stat.  Given that

there were 744,369 background checks conducted for gun purchases in Florida during 2014, and

at least 500,000 checks were made each year from 2009 forward, the liklihood of dealing with

a legally armed citizen is not really a likelihood, but more of a certainty.

https://www.fbi.gov/about-us/cjis/nics/reports/nics_firearm_checks_-_year_by_state_type.pdf

(Last visited Nov. 6, 2015).  To allow a government, such as Tampa, to ignore these facts and

fail to train on officers how to deal with law abiding armed citizens diminishes the rights of

citizens.  At the same time they claim the need and ability to interact with any gun owner, seizing

their person and their property as long as they wish, Defendants claim they have no need to make

sure officers know such an important law.  Defendants acknowledge that the U.S. Supreme Court

has noted that an obvious training need exists in cases of deadly force.  (Dckt. 11 at pg. 12-13).

Given that the most common reason an officer would need to use deadly force is an armed

suspect, this Court should find that there is a clear and obvious need to train officers on who is

legally allowed to carry a firearm and what the limits of the officer's authority is when dealing

with lawfully armed persons.  Failing to hold that such a need is obvious is nothing less than an

open invitation to cities to abuse their power by refusing to train officers, and allowing the abuse

of one of the most law abiding segments of society.[3]

---

[3] Florida's data shows that those who lawfully carry concealed firearms are generally among the most law abiding and responsible demographic for which there are statistics. *Fla. Dep't of Agriculture and Consumer Servs., Div. Of Licensing, Concealed Weapon or Firearm License, Summary Report October 1, 1987-September 30, 2015*, available at http://www.freshfromflorida.com/content/download/7499/118851/cw_monthly.pdf (Last Visited 10/16/15).  As of January 2011, of the over 2.4 million Concealed Carry Licenses that Florida has issued since the statewide program's inception in 1987, only 168 have been revoked for the subsequent commission of a crime involving a firearm. *Id.* A number so statistically insignificant that the Department of Agriculture no longer tracks that data point.

**VI.    Plaintiffs are entitled to declaratory relief pursuant to Sec. 790.33(3)(f) in order to accomplish the Legislative intent of Sec. 790.33 (2).**

Defendants properly assert the elements of Florida's Declaratory Judgment statute. 86.011, Fla. Stat.  Since Plaintiffs did not bring an action based on that statute, those elements are irrelevant.  Sec. 790.33, stands on its own, without reference to Sec. 86.011.  See, *Florida Carry v. Univ. of Fla*. 2015 Fla. App. LEXIS 16115 (Fla. 1st DCA 2015)(holding that Florida's sovereign immunity statute has no application to actions brought under Sec. 790.33).   If Plaintiff's could have brought an action under Sec. 86.011 then the provisions of Sec. 790.33 providing for a declaratory action would be duplicative and meaningless.  Sec. 790.33 sets forth its own elements for a declaratory action.

The elements for declaratory relief under Sec. 790.33, are:

1.    A person or organization whose membership is adversely affected;
2.    By any . . . measure, directive, rule, . . . order, or policy, ...;
3.    Enforced in violation of Sec. 790.33;
4.    May file suit against any . . . municipality.

Sec. 790.33(3)(f). Plaintiffs have alleged that they have been adversely affected by Defendants' actions in trespassing persons who are openly carrying while fishing. (Comp. 72-73).  Plaintiffs have alleged that Defendants acted on a rule, regulation, policy or procedure, that they individually or collectively created to detain any person with a firearm, regardless of the lawfulness of the person's conduct and that they are doing so in violation of Sec. 790.33. (Comp. 293-295).

The right to declaratory relief in Sec. 790.33 accomplishes the express intent of the Legislature to deter and prevent abuse of local authority by requiring reviewing courts to determine, regardless of issues of immunity and other claims, whether defendants are in fact

violating the statute.  This is important to insure that Defendants will not be able to claim not a

clearly established right in future and to vindicate the well established right to insure that

Freeman and members of Florida Carry, will not be deprived of liberty or property.

Plaintiffs concede that the injunction is only applicable to the City, and not to the

individual Defendants. See, *Florida Carry, Inc., 2015* Fla. App. LEXIS 16115.

**VII.    Running serial numbers is not necessary or a valid investigative tool unless there is probable cause to believe that the firearms are stolen**.

Defendants assert that they have a recognized right to run the serial numbers of firearms

they temporarily seize from individuals.  Their justification is an exception to liability under Sec.

790.335 that allows law enforcment to maintain a list of firearms reported stolen.  According to

Defendants, this evidences an intent by the Legislature to allow Defendants to run the serial

number of any gun at any time Defendants manage to get their hands on it.   Importantly,

Defendants do not deny that they are keeping a database of all serial numbers they run or who

owns those firearms.  Instead they claim that the Legislature recognizes that running of a serial

number does not [necessarily] create a record.   Plaintiffs have specifically alleged that

Defendants run the serial numbers of all firearms that come into their possession.  (Comp. 300-

304).  Plaintiffs further allege that Defendants are doing so to create a registry of firearms and

owners as there is no other lawful authority or purpose.

Once again, contrary to Defendants claims, there is binding case law regarding the

running of serial numbers. *Arizona v. Hicks*, 480 U.S. 321 (1987)(holding that the authority to

move stereo equipment to obtain and run a serial number is only found where the state has the

authority to seize the property based on probable cause that the property is stolen).  It is a matter

of legislative finding, that this Court must accept, that:

2.     A list, record, or registry of legally owned firearms or law-abiding firearm
owners is not a law enforcement tool and can become an instrument for
profiling, harassing, or abusing law-abiding citizens based on their choice
to own a firearm and exercise their Second Amendment right to keep and
bear arms as guaranteed under the United States Constitution. Further,
such a list, record, or registry has the potential to fall into the wrong
hands and become a shopping list for thieves.

3.     A list, record, or registry of legally owned firearms or law-abiding firearm
owners is not a tool for fighting terrorism, but rather is an instrument that
can be used as a means to profile innocent citizens and to harass and
abuse American citizens based solely on their choice to own firearms and
exercise their Second Amendment right to keep and bear arms as
guaranteed under the United States Constitution.

790.335 (1)(a), Fla. Stat.

Defendants do not claim that they had arguable reasonable suspicion or probable cause
to run the serial numbers on Freeman's gun. Nor do they offer any justification for coming into
possession of the gun that was in his vehicle. Instead they argue that because the Legislature
authorized the keeping of a list of firearms reported as stolen, the Legislature has abrogated the
Fourth Amendment, to allow Defendants to run serial numbers of firearms regardless of any
suspicion or cause to do so, and to obtain those firearms by unlawful searches of vehicles.

As stated by the Legislature, a list of serial numbers is not a legitimate law enforcement
tool and is rife with the potential for abuse. If Defendants are allowed to record the serial
numbers of every firearm they lay their hands on, and record that information on an incident
report as in this case, the beginnings of a firearm and owner registration list is in their possession.
In fact, the Defendants have recorded and kept the serial numbers of all three of Freeman's
firearms as shown by their General Offense Hardcopy. (Ex. A)

**VIII.   Defendants rely on a misstatement of law to claim that Plaintiffs are not entitled to injunctive relief.   Where provided by statute must use statutory factors not common law injunction factors.**

Defendants claim that this Court should dismiss Plaintiffs' claims for injunctive relief due to an alleged failure to meet the common law elements for injunctive relief.  Defendants cite no applicable authority for their contention.  Injunctive relief provided for by statute is separate and apart from the Court's inherent ability to grant injunctive relief at common law.  *Pinecrest Lakes, Inc. v. Shidel,* 795 So. 2d 191(Fla. 4th DCA)(rejecting developers claim that citizens enforcing a right to statutory injunction were required to meet the common law injunction elements); *Banco Industrial de Venezuela, C.A. v. Mederos Suarez,* 541 So. 2d 1324, 1326 (Fla. 3d DCA 1989)(statute modified common law injunction requirements by referring to common law requirements but excluding requirement of irreparable harm).

**IX.   Plaintiffs concede that the official capacity claim against Graham should be dismissed.**

Plaintiffs concede that Defendant Ronald Graham is not a final policy maker and that the official capacity claim against him is due to be dismissed.  Plaintiffs further concede that Graham's actions are insufficient to bind the city under Sec. 1983 liability.  However, Plaintiffs do not concede that the city has no municipal liability.

**X.   Counts 7 and 9 are not duplicative and are independent claims.**

Defendants allege that they had  authority to detain Freeman based on a specious claim that Freeman violated two statutes.  Count 7 addresses Defendants' claims of qualified immunity for the initial detention as set forth in Section III of this response, *supra.* Count 9 addresses the continued detention of Freeman after Defendants were aware there was no violation of law by

Freeman. See, *Rodriguez v. United States,* 135 S. Ct. 1609, 1612 (April 21, 2015)(holding that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."). Count 9 is a necessary separate count in case this Court determines that Defendants did have an arguable reasonable suspicion for the initial stop. Upon making such a finding the Court would be obligated to dismiss Count 7.

Regardless of the propriety of the initial detention, *Rodriguez* makes clear that once the need for the initial detention was over, the continued detention for a new purpose, or a purpose that the officers knew to be unlawful, would not be lawful based merely on the propriety of the initial stop. The sole purpose, undisputed by Defendants' motion, was to issue a trespass warning against Freeman. The detention of Freeman during that time had no lawful purpose, and instead was so that the Defendants could continue to violate Plaintiff's liberty and property interests, while they prepared the form to further limit his liberty and free speech rights.

**WHEREFORE**, Plaintiffs' respectfully request the Court deny Defendants' Motion to Dismiss.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished this  6th  day of November, 2015, via electronic service and e-mail, to the following:

**Ursula Richardson, Esquire**
315 East Kennedy Boulevard, 5th Floor
Tampa, FL 33602
ursula.richardson@tampagov.net
imelda.higgins@tampagov.net

**FLETCHER & PHILLIPS**

 /s/ Eric J. Friday
**Eric J. Friday, Esquire**
Florida Bar No.: 0797901
541 East Monroe Street
Jacksonville, FL 32202
Telephone: (904) 353-7733
FamilyLaw@FletcherandPhillips.com
EFriday@FletcherandPhillips.com
***Attorneys for the Plaintiffs***